2018 IL App (2d) 160920
No. 2-16-0920
Opinion filed June 26, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06-CF-146 |
| MARCIAL GUERRERO, | ) ) ) | Honorable Timothy J. McCann, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Jorgensen specially concurred, with opinion.
Justice Hutchinson concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 This is the third appeal brought by defendant, Marcial Guerrero. In 2006, he was charged

by indictment with three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-

14.1(a)(1) (West 2004)). All three counts alleged that he sexually penetrated the victim. The

first count was based on contact between defendant's penis and the victim's mouth, the second

count was based on defendant's placing his finger into the victim's vagina, and the third count

was based on contact between defendant's penis and the victim's anus. Following a jury trial in

2007, defendant was convicted of all three counts and sentenced to three consecutive terms of 25

years' imprisonment. Defendant raised several issues on direct appeal, none of which involved

the sufficiency of the evidence, and we affirmed his conviction and sentence. *People v. Guerrero*, No. 2-07-1183 (2010) (unpublished order under Illinois Supreme Court Rule 23) (*Guerrero I*).

¶ 2    Thereafter, defendant filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)).  The trial court summarily dismissed the petition and defendant appealed, arguing that his appellate counsel was ineffective on direct appeal for failing to challenge the sufficiency of the evidence with respect to the second count in the indictment.  Specifically, defendant argued that there was nothing at trial to indicate that his finger ever intruded into the victim's vagina.  We held that defendant's petition stated the gist of a constitutional claim, and, accordingly, we reversed the trial court's summary dismissal and remanded the matter for further proceedings.  *People v. Guerrero*, 2013 IL App (2d) 111161-U (*Guerrero II*).

¶ 3    On remand, defendant's appointed postconviction counsel filed an amended petition and a second amended petition.  Among the numerous issues raised in the second amended petition was the claim at the center of our holding in *Guerrero II*.  However, the trial court granted the State's motion to dismiss the second amended petition, and defendant now appeals.  As was the case in *Guerrero II*, defendant's sole contention in this appeal is that his appellate counsel was ineffective on direct appeal for failing to argue that the evidence at trial was insufficient to sustain a conviction on the second count in the indictment.

¶ 4    As we will explain, defendant has made a substantial showing of a constitutional violation, and we therefore reverse the trial court's dismissal of his second amended postconviction petition.  However, the parties also dispute the relief that should be granted under these circumstances.  We will address that issue following our discussion on the merits.

¶ 5                                    I. BACKGROUND

¶ 6     Before discussing the evidence adduced during defendant's trial, we first provide a brief overview of the legal issue that forms the basis of this appeal.  To sustain defendant's convictions of predatory criminal sexual assault of a child, the State was generally required to prove that defendant committed acts of "sexual penetration" with the victim.  720 ILCS 5/12-14.1(a)(1) (West 2004).  At the time of the alleged acts, "sexual penetration" was defined as follows:

> " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration.  Evidence of emission of semen is not required to prove sexual penetration."  720 ILCS 5/12-12(f) (West 2004).

¶ 7     In *People v. Maggette*, 195 Ill. 2d 336, 346-47 (2001), our supreme court noted that this definition of "sexual penetration" defines "two broad categories of conduct."  First, the "contact" clause describes any contact with the sex organ or anus of one person by an object, the sex organ, mouth, or anus of another person.  Second, the "intrusion" clause describes any intrusion of any part of the body of one person or of any animal or object into the sex organ or anus of another person.  *Id*. at 347.  The court determined that, as used in the intrusion clause, the word "object" was limited to "inanimate objects."  *Id*.  Hence, under principles of statutory construction, the word "object" in the contact clause was not intended to include parts of the body.  *Id*. at 349-50.

¶ 8     Applying *Maggette* to the second count in this case, the State could not sustain a conviction based on evidence that defendant's finger merely came in contact with the victim's

vagina. Rather, the State was required to prove that there was an intrusion, however slight, of defendant's finger into the victim's vagina. See 720 ILCS 5/12-12(f) (West 2004). With this in mind, we now turn to the evidence at defendant's trial.

¶ 9                                        A. Trial

¶ 10    The victim, P.G., was 11 years old at the time of the alleged criminal acts. Because she did not make her initial outcry until she was 13 years old, the State was unable to introduce her out-of-court statements at trial. See 725 ILCS 5/115-10(b)(3) (West 2006). P.G. was 15 years old at the time of trial. She was the State's first witness. Her testimony was conducted via a closed-circuit television system.

¶ 11    On direct examination, P.G. testified that her mother began dating defendant in January 2003. Shortly thereafter, defendant moved into an apartment shared by P.G. and her mother, along with P.G.'s younger sister and infant brother. P.G. described a pattern of conduct by defendant that took place over the course of approximately one month. According to P.G., when her mother was at work during the night, defendant would bring her into her mother's bedroom, remove her clothes, and begin touching her. When P.G. was asked to describe the first time that this happened, the following exchange took place:

"A.  He—he put his thing—he put his d***—no, he put his d*** like by my—I don't know how to say it, but like he put it towards like the butt hole and everything.

[MR. REIDY (PROSECUTOR)]: That was the first time you were with him?

A. Yeah.

Q. So we're clear what we're talking about, what body part are you referring to?

A. The boobs. He touched the boobs. And my vagina.

Q. Let's slow down 'cause I know it's taken—

A. Yeah.

Q. Let's take a deep breath. The first time your clothes were off, what, if anything, did he—did [defendant] do to you to start off with? You said he touched where?

A. My boobs. He started going down to the vagina.

Q. Where on your vagina did he touch you?

A. Like by the crack.

MR. REIDY: If the record could reflect she's indicated in between her fingers, it would be I guess the crevice or the crack of the fingers.

THE COURT: Yes, record may so reflect.

[MR. REIDY]: With what did he touch you there?

A. With his hands.

Q. How did that make you feel?

A. I thought he would do nothing like that, nothing like that."

¶ 12   The prosecutor asked P.G. how many times defendant's hand came "in contact" with her "vagina and crack," and she answered that this happened approximately 10 times. P.G. added that defendant placed his penis near her anus on at least three occasions, that he forced her to perform oral sex on him approximately five times, and that his penis came in contact with her vagina approximately two times. P.G. was also asked whether defendant did "anything else of a sexual nature with [her] other than sucking—having [her] suck his d***, penis against your butt hole." She answered, "I don't think so." When P.G. was asked whether defendant was able to "go inside" her vagina with his penis, she answered, "No. I screamed."

¶ 13    On cross-examination, when P.G. was asked whether defendant did anything other than use his hand to touch her breasts and vagina on the first night, she responded, "I think that's it. I don't remember." Defense counsel pressed the issue, referencing a statement that P.G. had purportedly made to investigators before the trial. The exchange went as follows:

"[MS. CHUFO (DEFENSE COUNSEL)]:    That was it?    When you were interviewed by those two men that came to your apartment, isn't it true that you told them that he also put his fingers in your vagina that first night?

A.    They were closed, yeah.    Yeah.

Q.    When you say they were closed—

A.    Like this, like by the crack.

Q.    Isn't it true that you said that his fingers went in a little bit?

A.    No.    That was like another night, he put his d*** almost in my vagina—or he tried to, but I screamed."

¶ 14    On redirect examination, the prosecutor did not question P.G. as to any instances of vaginal contact or intrusion.

¶ 15    The remaining witnesses offered little to elucidate the issue of whether defendant's finger intruded into P.G.'s vagina. P.G.'s sister testified that defendant would take P.G. into his bedroom at night when their mother was at work. P.G. would return crying, but she never explained why. P.G.'s mother testified that she learned of P.G.'s allegations for the first time in 2006, when investigators came to her apartment. She added, "[a]t this day I don't even know what's happening 'cause [P.G.] hasn't told me what [defendant] did to her." Tim Martin, an investigator with the Kane County Child Advocacy Center, testified that he interviewed P.G. in 2006, regarding a report that P.G. made to her school counselor. He testified that P.G. began

crying when she was questioned about her allegations of sexual contact with defendant. Finally, P.G.'s former neighbor testified that, when she was 16 years old, she had sexual intercourse with defendant. This was reported to police in December 2003. Defendant was then arrested in January 2004, approximately one year after he moved in with P.G.'s family. He was convicted of aggravated criminal sexual abuse and sentenced to three years in prison. The trial court admitted a certified copy of that conviction into evidence, and the State rested its case.

¶ 16 Defendant's theory of the case was that P.G. made false allegations against him to prevent him from returning to live with her family after he completed his prison term for aggravated criminal sexual abuse. Defendant first presented Hollida Wakefield, an expert witness qualified in the field of psychology. She testified that, in addition to reviewing Martin's written report of his interview with P.G., she had also reviewed a recorded interview with P.G. The recorded interview, which was conducted by a different investigator, took place after Martin's interview. Wakefield noted that there were "significant contradictions" between Martin's report and the recorded interview. Wakefield explained that, because Martin's interview was not recorded, she could not be certain whether Martin had used suggestive questions or whether his approach impacted the subsequently recorded interview. On cross-examination, Wakefield confirmed that P.G. commented during her recorded interview that defendant "touched [her] boobs," but Wakefield was not asked about any statements involving an intrusion into P.G.'s vagina.

¶ 17 Defendant's remaining witnesses laid the foundation for his theory as to P.G.'s motive for making false allegations. Bryan Buck, the former principal at P.G.'s elementary school, testified that P.G.'s attendance improved while defendant was living with P.G.'s family. Rose Gossmeyer, an investigator with the Department of Children and Family Services, testified that

she investigated P.G.'s family regarding a January 2004 report that defendant was striking the female children with a belt. Linda Ibarra, defendant's sister-in-law, testified that she lived on the same street as P.G.'s family when defendant's alleged criminal acts took place. Linda first learned of P.G.'s allegations soon before defendant was scheduled to be released from prison. After learning of the allegations, Linda asked P.G. what happened. Linda testified, "[P.G.] just said that [defendant] touched her." Although P.G. pointed to her lower region, she did not give Linda any more details.

¶ 18    Defendant testified on his own behalf. He explained that P.G. and her sister "had no discipline" when he first moved in with the family. Defendant began enforcing rules, such as making sure the girls went to school and preventing them from watching television until they completed their homework and chores. Defendant testified that the girls did not respond well to being grounded, so he eventually resorted to disciplining them physically. He acknowledged that he threatened them with the use of a belt and that he once used a belt to strike P.G.'s sister. However, defendant denied that he ever abused P.G. sexually. When asked whether P.G. ever cried during the night, defendant testified that there were several occasions when P.G. and her sister stayed up late watching scary movies. According to defendant, P.G.'s crying was the result of nightmares.

¶ 19    The State called P.G.'s sister on rebuttal. She denied that there was ever a time when P.G. cried because of nightmares.

¶ 20    During closing arguments, with respect to P.G.'s testimony, the prosecutor argued, "[w]hat did [P.G.] tell you? She told you that on different occasions he put his penis in her mouth. He rubbed his penis between her butt cheeks and touched her anus, her butt hole. And he ran his fingers over her vagina into the crack. That's what she told you." The prosecutor then

read from the jury instruction defining "sexual penetration," which was a near-verbatim recitation of the statutory definition set forth above (see *supra* ¶ 7). Regarding the second charge in the indictment, the prosecutor argued in relevant part:

> "To sustain the charge of predatory criminal sexual assault of a child, finger into the vagina, the State must prove the following propositions. ***
>
> First proposition, defendant knowingly committed an act of sexual penetration with [P.G.]. Remember, that prior sexual penetration instruction is any contact, however slight.
>
> He rubbed his finger into her vagina. He didn't have to penetrate all the way. We've met our burden on that one folks."

¶ 21    Defense counsel's argument was focused on P.G.'s inconsistencies and motivation for lying. Although counsel briefly discussed P.G.'s allegation that defendant's hand "came in contact" with her vagina, there was no specific reference to the jury instruction defining "sexual penetration."

¶ 22    The jury deliberated and found defendant guilty of all three counts. Defendant was sentenced to a 25-year term of imprisonment on each count, to be served consecutively. On direct appeal, defendant contended that (1) the trial court erred in admitting his aggravated-criminal-sexual-abuse conviction (2) several comments made by the prosecution amounted to prosecutorial misconduct; and (3) the trial court abused its discretion in determining his sentence. In *Guerrero I*, we affirmed defendant's conviction and sentence.

¶ 23                                B. Postconviction Proceedings

¶ 24    In June 2011, defendant filed a *pro se* petition for postconviction relief. One of the issues raised was whether his appellate counsel was ineffective on direct appeal for failing to challenge

the sufficiency of the evidence. The trial court summarily dismissed defendant's petition, ruling that the issues raised were forfeited. Defendant filed a motion to reconsider, which the trial court denied, and defendant appealed.

¶ 25    In *Guerrero II*, defendant argued that his appellate counsel was ineffective on direct appeal for failing to challenge the sufficiency of the evidence, specifically with respect to the second count in the indictment. In response, the State first argued that defendant forfeited the issue, because his *pro se* petition did not specifically challenge the evidence of "sexual penetration." We rejected the State's forfeiture argument, holding that the specificity of defendant's claim "represent[ed] a 'borderline' question which, under a liberal construction, should be resolved in defendant's favor." *Guerrero II*, 2013 IL App (2d) 111161-U, ¶ 22 (citing *People v. Hodges*, 234 Ill. 2d 1, 21 (2009)).

¶ 26    On the merits, the parties compared the evidence in this case to the evidence in *People v. Bell*, 234 Ill. App. 3d 631 (1992). See *Guerrero II*, 2013 IL App (2d) 111161-U, ¶¶ 25-28. Because in this appeal the parties are once again disputing the application of *Bell*, we will provide a brief summary of that case.

¶ 27                                                    1. *Bell*

¶ 28    *Bell* involved crimes against two different victims. Applying the well-known standard of review for challenges to the sufficiency of the evidence, established in *People v. Collins*, 106 Ill. 2d 237 (1985), the *Bell* court came to a different conclusion with respect to each victim. Regarding the first victim, the court found "ample evidence" to establish proof of "sexual penetration" where the victim testified that the defendant " 'handled' and 'rubbed' her vagina." *Bell*, 243 Ill. App. 3d at 636.

¶ 29    The second victim similarly testified that the defendant "rubbed" her vagina with his finger, and a police officer testified to the victim's statement that the defendant "felt" her vagina. The *Bell* court noted that, "[i]f these statements were the only evidence in the record concerning penetration, we would deem them sufficient to affirm the defendant's conviction under the *Collins* standard, in view of the fact that the jury is entitled to draw reasonable inferences from the evidence, including an inference of penetration." *Id.* However, unlike the first victim, the second victim was specifically asked, " 'did he rub you or put his finger in you? What exactly did he do?" The victim responded, " 'Rubbed it.' " The *Bell* court held in relevant part:

> "While, as noted above, the jury is entitled to draw inferences from the evidence, such inferences must be reasonable. Although under other circumstances a jury might reasonably infer that an act of penetration occurred based on the testimony that defendant rubbed and felt [the second victim's] privates, *such an inference is not reasonable where [the second victim's] answer to the specific question of whether any penetration took place was implicitly negative.* We hold, therefore, that there was insufficient evidence of penetration of [the second victim] and [the defendant] was not proved guilty beyond a reasonable doubt of aggravated criminal sexual assault upon [the second victim]." (Emphasis added.) *Id.* at 637.

¶ 30                                  2. *Guerrero II*

¶ 31    Returning to this case, in *Guerrero II*, the State argued that P.G.'s testimony was analogous to that of the first victim in *Bell*, while defendant argued that P.G.'s testimony was closer to that of the second victim. Defendant pointed specifically to the exchange on cross-examination regarding the statements that P.G. had purportedly made to investigators before trial:

"[DEFENSE COUNSEL]: Isn't it true that you said that his fingers went in a little bit?

A. No. That was like another night, he put his d*** almost in my vagina—or he tried to, but I screamed."

We agreed with defendant, holding in pertinent part:

"Like *Bell*, while we recognize that a jury may reasonably infer penetration, such an inference is not reasonable when the victim's answer to a specific question regarding penetration was implicitly negative. [Citation.] Here, the victim's answer to defense counsel's question was implicitly negative in that, although defendant touched her 'by the crack' of her vagina, the victim testified that defendant did not penetrate her vagina with his finger." *Guerrero II*, 2013 IL App (2d) 111161-U, ¶ 28.

¶ 32 Accordingly, we held that defendant's *pro se* petition sufficiently alleged the gist of a constitutional claim. However, we expressed no opinion as to whether defendant's claim would ultimately prevail. We therefore reversed the trial court's summary dismissal and remanded the matter for second-stage postconviction proceedings. *Id.* ¶ 30.

¶ 33                     3. Second-Stage Postconviction Proceedings

¶ 34 On remand, defendant's appointed postconviction counsel filed an amended petition and a second amended petition. Although the second amended petition raised numerous issues that were not discussed in *Guerrero II*, a significant portion was devoted to the issue of whether appellate counsel was ineffective for failing to challenge the sufficiency of the evidence with respect to the second count in the indictment. The State moved to dismiss the second amended petition, arguing that, "[u]pon review of the entire record, not just portions that are presented by [defendant], this claim should be dismissed as there is sufficient evidence to support the

conviction as to Count II." Following a hearing, the trial court granted the State's motion to dismiss, holding as follows:

"In his petition, [defendant] asserts that appellate counsel failed to raise the issue of the sufficiency of the evidence. However, a review of the matter reveals that [defendant] has not established that he was prejudiced by the actions of his appellate counsel. Merely asserting that appellate counsel should have raised this issue does not establish prejudice. My review of the lengthy record of proceedings shows that there was sufficient evidence presented, even if some areas of the evidence were disputed. Thus, even if counsel had decided to raise that issue, there is no evidence that the outcome of these proceedings would have been any different."

¶ 35   Defendant now timely appeals.

¶ 36                            II. ANALYSIS

¶ 37   As we have discussed, defendant's sole contention is that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence with respect to the second count in the indictment. However, rather than remand the matter for further postconviction proceedings, defendant asserts that we should simply reverse the conviction and vacate the corresponding sentence. According to defendant, "[t]his outcome comports with the purely legal nature of the issue and serves the interest of judicial economy."

¶ 38   The State counters by arguing that, contrary to our holding in *Guerrero II*, P.G. did not implicitly reject a specific question as to whether there was a digital intrusion. Thus, the State maintains that the evidence was indeed sufficient to sustain a conviction on the second count. The State next argues that, even if we agree with defendant on the merits, the proper remedy is to remand the matter for further postconviction proceedings.

¶ 39                                                      A. Merits

¶ 40    The Post-Conviction Hearing Act creates a three-stage process for the adjudication of postconviction petitions. *People v. Harris*, 224 Ill. 2d 115, 125 (2007). At the first stage, the trial court must review the petition within 90 days of its filing and determine whether it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2012); see also *People v. Allen*, 2015 IL 113135, ¶ 24 (explaining that a first-stage dismissal is inappropriate if a petition alleges sufficient facts to state the "gist of a constitutional claim"). If the petition is not summarily dismissed at the first stage, it advances to the second stage, where an indigent petitioner is entitled to appointed counsel, the petition may be amended, and the State may answer or move to dismiss the petition. 725 ILCS 5/122-4 (West 2012). At the second stage, the petitioner bears the burden of making a "substantial showing of a constitutional violation." *People v. Domagala*, 2013 IL 113688, ¶ 35. In other words, the petitioner must show that he would be entitled to relief if his well-pleaded allegations of a constitutional violation are proved true. For purposes of second-stage proceedings, the petitioner's allegations are taken to be true unless they are affirmatively refuted by the record. *Id.* If the petition advances to the third stage, the trial court must conduct an evidentiary hearing and enter any appropriate orders with respect to the conviction or sentence in the former proceedings. 725 ILCS 5/122-6 (West 2012).

¶ 41    When a postconviction petition is dismissed without an evidentiary hearing, we apply the *de novo* standard of review. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 42    Here, we are reviewing the second-stage dismissal of defendant's claim that he received ineffective assistance of counsel on direct appeal. To prevail on such a claim, a defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). See also *People v. Easley*, 192 Ill. 2d 307, 328 (2000) (applying *Strickland* to test the adequacy of

appellate counsel). First, it must be shown that counsel's performance fell below an objective standard of reasonableness. Second, it must be shown that counsel's performance was prejudicial, meaning that there is a reasonable probability that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 691-94.

¶ 43    "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *Easley*, 192 Ill. 2d at 329. Here, defendant argues that appellate counsel should have challenged the sufficiency of the evidence with respect to the second count in the indictment.

¶ 44    When a defendant challenges the sufficiency of the evidence, it is not the function of this court to retry him. *Collins*, 106 Ill. 2d at 261 (adopting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* at 261 (quoting *Jackson*, 443 U.S. at 319). A reviewing court will not substitute its judgment for that of the fact finder on questions regarding the weight to be given a witness's testimony, the credibility of the witnesses, the resolution of inconsistencies and conflicts in the evidence, and the reasonable inferences to be drawn from the testimony. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 45    Applying these standards to the instant case, to survive the second stage of the postconviction proceedings, defendant needed to make a substantial showing that (1) his appellate counsel's failure to challenge the sufficiency of the evidence with respect to the second count in the indictment was objectively unreasonable and, (2) absent this failure, his conviction

would have been reversed on direct appeal. See *People v. Meeks*, 2016 IL App (2d) 140509, ¶ 4. We hold that defendant has satisfied both of these requirements.

¶ 46     At the crux of this appeal is our holding in *Guerrero II*, that P.G. gave an "implicitly negative" response to a "specific question regarding penetration." *Guerrero II*, 2013 IL App (2d) 111161-U, ¶ 28. We note that our holding in this respect was judicial *dictum*, not mere *obiter dictum*. Although it was not essential to our ruling that defendant's *pro se* petition stated the gist of a constitutional claim, it was nonetheless an expression of an opinion on an issue that was briefed by the parties and " 'deliberately passed upon' " by this court. See *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236-37 (2010). The fact that *Guerrero II* involved the first-stage dismissal of defendant's *pro se* petition played no role in our determination that, pursuant to *Bell*, P.G. gave an "implicitly negative" response. That decision is therefore "entitled to much weight and should be followed unless found to be erroneous." *Id.* at 237.

¶ 47     The State maintains that our holding was incorrect, asserting that P.G. was asked only whether she had previously *told investigators* that defendant put his fingers in her vagina *on the first night of the abuse*. The State argues that, unlike the second victim in *Bell*, P.G. was never asked the specific question of whether there was, in fact, a digital intrusion into her vagina. As set forth above, the testimony in dispute appears in the record as follows:

> "[MS. CHUFO (DEFENSE COUNSEL)]: That was it? When you were interviewed by those two men that came to your apartment, isn't it true that you told them that he also put his fingers in your vagina that first night?
>
> A. They were closed, yeah. Yeah.
>
> Q. When you say they were closed—
>
> A. Like this, like by the crack.

Q. Isn't it true that you said that his fingers went in a little bit?

A. No. That was like another night, he put his d*** almost in my vagina—or he tried to, but I screamed."

¶ 48    The State argues that, because of the way defense counsel's questions were phrased, P.G.'s answer is ambiguous and subject to three reasonable interpretations. First, as we concluded in *Guerrero II*, P.G. might have implicitly denied that there was a digital intrusion. Second, P.G. might have denied that she told investigators that there was a digital intrusion. Third, P.G. might have simply denied that there was a digital intrusion on the first night of the abuse. The State suggests that the third interpretation carries an additional inference—that there was, in fact, a digital intrusion on a different night. The State concludes by arguing that, after her initial "No," P.G.'s second sentence "appears to resolve the ambiguity in favor of the proposition that the digital intrusion did not occur during the first incident with [defendant]. Yet, the jury, who saw and heard [P.G.], was in the better position to determine the tone and manner of [P.G.] to best put her answer in appropriate context."

¶ 49    The State has not persuaded us that our holding in *Guerrero II* was incorrect. A reviewing court must allow all reasonable inferences from the record in favor of the prosecution, but it may not allow unreasonable inferences. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Thus, "if only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *Id*. Here, regardless of how defense counsel's questions were phrased, it remains that P.G. was asked a specific question about a digital intrusion. The only reasonable inference to be taken from her response is that she implicitly denied that any such intrusion took place.

¶ 50    To begin, there is no merit to the State's suggestion that P.G. was implying that she had been digitally intruded on some night other than the first night of her abuse. Reading P.G.'s initial answer, "No," in isolation, it might be reasonable to conclude that P.G. was denying having *told investigators* that there was a digital intrusion, whether on the first night or some other night. However, by going on to state, "[t]hat was like another night, he put his d*** almost in my vagina—or he tried to, but I screamed," P.G. was clearly addressing defendant's actual conduct, not just what she had told investigators about defendant's conduct. We therefore follow our holding in *Guerrero II*, that P.G. gave an "implicitly negative" response to a "specific question regarding penetration." *Guerrero II*, 2013 IL App (2d) 111161-U, ¶ 28.

¶ 51    However, even if we were to conclude that P.G. did not implicitly deny having been digitally intruded, we agree with defendant that there was no other evidence to establish a digital intrusion. Arguing to the contrary, the State points to the following testimony from P.G. on direct examination, which was accompanied by a hand gesture:

"[MR. REIDY (PROSECUTOR)]: Let's take a deep breath. The first time your clothes were off, what, if anything, did he—did [defendant] do to you to start off with? You said he touched where?

A. My boobs. He started going down to the vagina.

Q. Where on your vagina did he touch you?

A. Like by the crack.

MR. REIDY: If the record could reflect she's indicated in between her fingers, it would be I guess the crevice or the crack of the fingers.

THE COURT: Yes, record may so reflect."

¶ 52    The State argues that the jury was in the best position to interpret P.G.'s hand gesture and consider it in conjunction with her testimony that defendant touched her "by the crack." Defendant counters that P.G.'s testimony and accompanying gesture are subject only to one reasonable interpretation: that defendant's finger touched the "crevice" or "crack" of her vagina. Defendant argues that, under *Maggette*, this is not sufficient to establish an "intrusion" under the definition of "sexual penetration." We agree with defendant.

¶ 53    The victim in *Maggette* testified that she remembered telling a police officer that the defendant touched her "vaginal area" over her panties and jumpsuit. She then added, " 'I remember him caressing me through my—to my knowledge it was—my panties was still up but he was just rubbing and caressing me through—he got underneath my panties—and I felt underneath my panties and *in* my vagina area and through it just right through it and his fingers going underneath it.' " (Emphasis in original.) *Maggette*, 195 Ill. 2d at 352. Our supreme court vacated the defendant's conviction of criminal sexual assault, holding that the victim's "brief and vague reference to her vaginal area" was not sufficient to prove an "intrusion." *Id.*

¶ 54    Here, P.G.'s testimony establishes only that defendant touched her in her vaginal area. The prosecutor described P.G.'s hand gesture by indicating that P.G. pointed to the "crevice" or "crack" that was "in between her fingers." Arguably, this could be viewed as describing an intrusion, however slight. However, the prosecutor's description came on the heels of his question as to where P.G. was touched "on" her vagina and P.G.'s response that she was touched "by the crack." Moreover, when P.G. used the same hand gesture during cross-examination, she reiterated that her fingers were "closed." Pursuant to *Maggette*, this evidence was insufficient to prove an "intrusion." See also *People v. Garrett*, 281 Ill. App. 3d 535, 545 (1996) (reversing the defendant's conviction of criminal sexual assault based on anal penetration, holding that "[t]he

touching of the anus on the outside by a finger of a person is insufficient to support a conviction for criminal sexual assault").

¶ 55    We acknowledge that we must give due consideration to the fact that the jury was in the best position to consider P.G.'s testimony and accompanying hand gesture. See *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 25. However, we cannot overlook that the prosecutor misled the jury during closing arguments.

¶ 56    First, the prosecutor characterized P.G.'s testimony as though she had claimed that defendant "ran his fingers over her vagina into the crack" and "rubbed his finger into her vagina." However, our thorough review of the transcript reveals that P.G. never gave any such testimony. Rather, as we have explained, she testified that defendant's hand came "in contact" with her vagina and that he "touched" her "by" her "crack."

¶ 57    Second, compounding the mischaracterization of P.G.'s testimony, the prosecutor misstated the legal principle established in *Maggette*. As noted, the prosecutor read from the jury instruction defining "sexual penetration," which closely mirrored the statutory definition set forth above (see *supra* ¶¶ 7, 21). In arguing that the evidence was sufficient to prove that defendant placed his finger into P.G.'s vagina, the prosecutor told the jury, "[r]emember, that prior sexual penetration instruction is any contact, however slight. *** We've met our burden on that one folks." This was an incorrect statement of the law, as the State was required to prove that there was an *intrusion*, however slight, of defendant's finger into P.G.'s vagina. See 720 ILCS 5/12-12(f) (West 2004); *Maggette*, 195 Ill. 2d at 349-50.

¶ 58    For all of these reasons, we hold that the State's evidence was insufficient to sustain a conviction of predatory criminal sexual assault of a child based on defendant's placing his finger into P.G.'s vagina. Thus, it follows that defendant's second amended postconviction petition

made a substantial showing of a constitutional violation as to his appellate counsel's failure to raise the issue on direct appeal.

¶ 59                                B. Relief

¶ 60    Having determined that the State's evidence was insufficient to establish the element of "sexual penetration" (finger into the vagina of P.G.), we must determine the proper relief. Defendant asks that we reverse his conviction on count II or, in the alternative, remand for third-stage postconviction proceedings. The State, citing *People v. Russell*, 345 Ill. App. 3d 16, 22 (2003), argues that "the only appropriate remedy is for the cause to proceed in accordance with sections 122-5 and 122-6 of the [Post-Conviction Hearing] Act."

¶ 61    We disagree with both defendant and the State. The posture of this case is the same as it would have been on direct appeal had defendant challenged the sufficiency of the evidence. We have all the power granted to a reviewing court pursuant to Illinois Supreme Court Rule 615 (eff. Jan. 1, 1967) (formerly codified at section 121-9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1965, ch. 38, ¶ 121-9). The State's reliance on *Russell* is misplaced. In *Russell*, the defendant claimed in his postconviction petition that his plea of guilty was involuntary because the trial court failed to admonish him that his sentence included a period of mandatory supervised release. The appellate court reversed the trial court's summary dismissal and concluded that the only appropriate remedy was to remand for docketing of the defendant's petition for second-stage proceedings. *Russell*, 345 Ill. App 3d at 22. The *Russell* court noted that a court has no authority to strike the mandatory supervised release period and that the State has no right to offer to withhold such period. *Id.*

¶ 62    In the instant case we have determined that the evidence was insufficient to sustain defendant's conviction on count II. Further hearing is unnecessary and would be a waste of

judicial time and resources. See *People v. Jimerson*, 166 Ill. 2d 211, 230-31 (1995). Although the evidence was insufficient to prove the element of sexual penetration for predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)), the evidence clearly established that defendant was guilty of the lesser-included offense of aggravated criminal sexual abuse (*id.* § 12-16(c)(1)(i)). A person commits aggravated criminal sexual abuse if that person is 17 years of age or older and commits an act of sexual conduct with a person under the age of 13. *Id.* " 'Sexual conduct' means any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused *** for the purpose of sexual gratification *** of the victim or the accused." *Id.* § 12-12(e). Our supreme court in *People v. Kennebrew*, 2013 IL 113998, ¶ 47, concluded that, under the charging-instrument approach, "the uncharged offense of aggravated criminal sexual abuse is a lesser-included offense of predatory criminal sexual assault."

¶ 63 We recognize that neither party requested a lesser-included-offense instruction at trial and that neither party has suggested on appeal that we invoke our power to reduce the degree of the offense of which defendant has been convicted (Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967)). However, forfeiture is not a concern, as the appellate court's power to reduce the degree of the offense is separate and apart from the power to reverse a conviction. Parties certainly have the right to request such relief, but reviewing courts have historically invoked the power *sua sponte*. See, *e.g.*, *People v. Ellis*, 107 Ill. App. 3d 603 (1982) (murder conviction reduced *sua sponte* to voluntary manslaughter); *People v. Coleman*, 78 Ill. App. 3d 989 (1979) (armed robbery conviction reduced *sua sponte* to robbery); *People v. Clark*, 70 Ill. App. 3d 698 (1979) (aggravated battery conviction reduced *sua sponte* to battery); *People v. O'Neil*, 50 Ill. App. 3d 900 (1977) (rape conviction reduced *sua sponte* to attempted rape where evidence was

insufficient to prove penetration); *People v. Goolsby*, 45 Ill. App. 3d 441 (1977) (murder conviction reduced *sua sponte* to voluntary manslaughter); *People v. Plewka*, 27 Ill. App. 3d 553 (1975) (indecent-liberties-with-a-child conviction reduced *sua sponte* to contributing to the sexual delinquency of a child); *People v. Borden*, 84 Ill. App. 2d 442 (1967) (burglary conviction reduced *sua sponte* to attempted burglary); *People v. Kurtz*, 69 Ill. App. 2d 282 (1966) (conviction of theft of property exceeding $150 in value reduced *sua sponte* to conviction of theft of property not exceeding $150 in value), *aff'd in par &, rev'd in part*, 37 Ill. 2d 103 (1967).

¶ 64    In each of these cases, the appellate court, apparently without the request of either party, exercised the power provided by Rule 615(b)(3).  In *Kurtz*, the supreme court noted that "[t]he authority of the appellate court to reduce the degree of the offense of which these defendants stood convicted is clear." *Kurtz*, 37 Ill. 2d at 111.

¶ 65    Notably, in *Bell*, 234 Ill. App. 3d at 637, one of the cases cited in defendant's own brief, the appellate court reduced the defendant's conviction *sua sponte* from aggravated criminal sexual assault to aggravated criminal sexual abuse, because the State had not proven penetration but had proven an act of sexual conduct.

¶ 66    *Kennebrew* is instructive here.  There, this court found that the State had not proven sexual penetration and we reversed one of the defendant's convictions of predatory criminal sexual assault of a child. *People v. Kennebrew*, No. 2-09-0754 (2011) (unpublished order under Illinois Supreme Court Rule 23).  The supreme court denied the State's petition for leave to appeal but issued a supervisory order directing this court "to consider whether the evidence was sufficient to sustain a conviction on the lesser-included offense of aggravated criminal sexual abuse." *Kennebrew*, 2013 IL 113998, ¶ 13.  Following the supreme court's directive, though we

found that the State had forfeited the argument, we considered the case on the merits. *People v. Kennebrew*, 2012 IL App (2d) 090754-U. Affirming our judgment, the supreme court noted: " '[S]tate and federal appellate courts have long exercised the power to reverse a conviction while at the same time ordering the entry of a judgment on a lesser-included offense.' " *Kennebrew*, 2013 IL 113998, ¶ 21 (quoting *People v. Knaff*, 196 Ill. 2d 460, 477-78 (2001)); see also *Morris v. Mathews*, 475 U.S. 237, 247 (1986) (appellate court may remedy violation of double jeopardy by modifying double-jeopardy-barred conviction to that of a lesser included offense that is not so barred).

¶ 67    At oral argument, we asked the parties why, if we were to agree with defendant that penetration had not been proven, we should not simply reduce defendant's conviction on count II to aggravated criminal sexual abuse. Defendant acknowledged that the evidence clearly established that he had touched P.G. on her vagina on approximately 10 occasions, but he argued that aggravated criminal sexual abuse has additional elements: "sexual gratification," "force or threat of force," and inability to "understand or consent." The State refused to concede that penetration had not been proven. Neither "force or threat of force," nor inability to "understand or consent," are elements of aggravated criminal sexual abuse based on the respective ages of the defendant and the victim. As our supreme court held in *People v. Kolton*, 219 Ill. 2d 353, 361-73 (2006), and *Kennebrew*, 2013 IL 113998, ¶¶ 33-36, the element of "sexual gratification or arousal" can reasonably be inferred where the indictment alleges "sexual penetration." In the instant case, as in *Kolton* and *Kennebrew*, there are no missing elements for purposes of modifying defendant's conviction on count II. Additional briefing is unnecessary.

¶ 68    In answer to the defendant's forfeiture argument in *Kennebrew*, the supreme court stated that "it would be unjust for the defendant to obtain an acquittal, after the jury found him guilty of

the greater offense, merely because the trial court erred in failing to find the evidence insufficient to sustain a conviction of the greater offense." *Kennebrew*, 2013 IL 113998, ¶ 24.

¶ 69    The dissent contends that we are "disrupting the natural course of our adversarial system" by invoking our broad authority under Rule 615(b)(3) *sua sponte. Infra* ¶ 82. At oral argument, when questioned regarding relief, the State explained that it did not "brief this issue on a lesser included offense" because it found no authority "on a lesser included offense in a second stage denial on an ineffective assistance of counsel argument." The State then acknowledged our authority to reduce the degree of the offense under Rule 615(b)(3). The State explained that, if we found the evidence insufficient on count II, it would ask for that relief going forward. Certainly, the dissent's point that the State could have requested this alternative relief sooner is well taken. However, the State's failure to do so in no way limits our authority to "utilize Rule 615(b)(3) to reduce the degree of a defendant's conviction." *Kennebrew*, 2013 IL 113998, ¶ 25.

¶ 70    The dissent maintains that it should be left to the State to first request a conviction of the lesser included offense, in a petition for leave to appeal to our supreme court. Where it is clear that the State's evidence proved all of the elements of the lesser offense, we see no useful purpose in requiring that step. It would be a waste of time and judicial resources. The dissent also takes issue with our observation that reviewing courts have historically invoked Rule 615(b)(3) *sua sponte*, suggesting that we are speculating. We noted just a few cases where a reviewing court reduced the degree of an offense even though neither party requested that relief. *Supra* ¶ 64. We reach this conclusion because those courts did not set out in their analyses that Rule 615(b)(3) relief was requested. Typically, when such relief is requested, a reviewing court says as much. See *People v. Lipscomb*, 2013 IL App (1st) 120530, ¶ 10; *People v. Rowell*, 229 Ill. 2d 82, 99 (2008); *People v. Hudson*, 71 Ill. App. 3d 504, 506 (1979); *People v. Falkner*, 61

Ill. App. 3d 84, 85 (1978); *People v. Oliver*, 38 Ill. App. 3d 166, 170 (1976). Fairly recently, this court invoked Rule 615(b)(3) to reduce a residential burglary conviction to burglary because the State failed to prove that the building the defendant entered was a " 'dwelling.' " *People v. Roberts*, 2013 IL App (2d) 110524, ¶ 10. We simply stated that " '[i]n its discretion, a reviewing court "may reduce the degree of an offense to a lesser[-]included offense when the evidence fails to prove the defendant guilty beyond a reasonable doubt of the greater offense." ' " *Id.* (quoting *People v. Alsup*, 373 Ill. App. 3d 745, 749 (2007), quoting *People v. Thomas*, 266 Ill. App. 3d 914, 926 (1994)). We trust that our colleagues would have mentioned in their analysis whether the State or the defendant had requested Rule 615(b)(3) relief. As our supreme court stated in *Kurtz*, 37 Ill. 2d at 111, "[t]he authority of the appellate court to reduce the degree of the offense *** is clear." The authority to reduce the degree of an offense under Rule 615(b)(3) serves the rights and interests of both parties, while also preserving the integrity of a jury verdict.

¶ 71 This case presents one of those situations in which a reviewing court is justified in addressing an issue not raised in the trial court, where the proper result is beyond any doubt and where an injustice might otherwise result. Given the unique facts of this case and the compelling evidence that defendant is guilty of the lesser included offense of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2004)), we modify defendant's present conviction to that lesser included offense. Also, because the trial court is in a better position than the court of review to impose appropriate punishment, we remand for sentencing on the modified conviction. See *Kurtz*, 37 Ill. 2d at 111-12.

¶ 72                                    III. CONCLUSION

¶ 73 For the reasons stated, we reverse the dismissal of defendant's postconviction petition. We hold that defendant was not proven guilty of predatory criminal sexual assault of a child as

alleged in count II but was proven guilty of aggravated criminal sexual abuse, and his conviction is so modified. The case is remanded for resentencing on count II.

¶ 74    As defendant was successful in this appeal, we decline the State's request for costs associated with this appeal. See 55 ILCS 5/4-2002 (West 2016).

¶ 75    Reversed; judgment affirmed as modified.

¶ 76    Cause remanded with directions.

¶ 77    JUSTICE JORGENSEN, specially concurring:

¶ 78    I concur that the evidence did not support a finding of predatory criminal sexual assault of a child on count II. I also, reluctantly, extend my concurrence to the decision to enter a conviction on the lesser included offense of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2004)) *despite the absence of any such request from the State*. Indeed, the State never charged defendant with the lesser included offense, submitted a lesser-included-offense jury instruction, or argued for entry of a lesser-included-offense conviction in this appeal. Yet, having reversed the conviction of the greater offense here, the proper remedy is charted by the majority decision in *Kennebrew*. I agree that we must follow those dictates and, so, I concur. I write separately simply to point out that the points raised by Justice Theis in her *Kennebrew* dissent, and echoed by my colleague Justice Hutchinson in her dissent here, still ring true.

¶ 79    JUSTICE HUTCHINSON, concurring in part and dissenting in part:

¶ 80    I dissent only because I would not enter a conviction of a lesser included offense absent a request from the State. I would grant defendant's requested relief and place the onus on the State to raise the issue for the first time in a petition for leave to appeal to our supreme court. There is no dispute that we have the authority to reduce the degree of a criminal conviction under Rule

615(b)(3). However, by invoking this authority *sua sponte*, the majority has taken it upon itself to correct the State's oversight. By contrast, I am hard-pressed to think of a case where a reviewing court has been so charitable toward a criminal defendant.

¶ 81 Despite multiple opportunities, the State has never once argued—or even suggested—that defendant should be convicted of aggravated criminal sexual abuse. At trial, P.G.'s testimony on the subject of digital penetration called into question the State's ability to sustain a conviction of predatory criminal sexual assault of a child. This should have prompted the State to request a jury instruction on the lesser included offense, but the State elected to stand on the greater offense charged in the indictment. On appeal in *Guerrero II*, given that defendant was essentially challenging the sufficiency of the evidence, the State could have made an alternative argument that the evidence was sufficient to sustain a conviction of the lesser included offense. Instead, the State simply argued that we should affirm the trial court's summary dismissal of defendant's postconviction petition. The State has now balked for a third time in this appeal, ignoring the possibility of a conviction of a lesser included offense and instead making an underwhelming argument that the only relief available to defendant is to have the matter remanded for a third-stage evidentiary hearing. And for all of this, the State is rewarded with a conviction of an offense that it repeatedly failed to recognize.

¶ 82 The majority no doubt objects to my characterization of the issue. According to the majority, the State is not being rewarded, but rather justice is being served. "This case," according to the majority, "presents one of those situations in which a reviewing court is justified in addressing an issue not raised in the trial court, where the proper result is beyond any doubt and where an injustice might otherwise result." *Supra* ¶ 71.

¶ 83　　I respectfully disagree that the majority has reached the "proper result" or prevented an "injustice." If the jury had properly applied the law in this case, it would have acquitted defendant on the second count of the indictment and double-jeopardy principles would have applied to bar any conviction of a lesser-included offense. See *People v. Henry*, 204 Ill. 2d 267, 289 (2003). If justice does not require judicial intervention in that instance, then why should it be any different here? The demands of justice are not altered because the jury convicted defendant based on insufficient evidence.

¶ 84　　The majority cites several cases to support its assertion that reviewing courts "have historically invoked the power [to reduce the degree of a criminal conviction] *sua sponte*." *Supra* ¶ 63. The majority states that, "[i]n each of these cases, the appellate court, apparently without the request of either party, exercised the power provided by Rule 615(b)(3)." *Supra* ¶ 64.

¶ 85　　These statements are somewhat misleading. While it is true that in each instance the reviewing court reduced the degree of the criminal conviction, and in each instance there was no discussion of whether the State made such a request, not once was it made clear that the degree of the conviction was being reduced *despite* the absence of any such request. The majority is therefore *speculating* that these courts were acting *sua sponte*. Moreover, unlike in the present case, it is evident that in certain instances the lesser included offense was an issue at trial. See, *e.g.*, *Ellis*, 107 Ill. App. 3d at 612 (defendant was charged with lesser included offense of voluntary manslaughter); *Goolsby*, 70 Ill. App. 3d at 834 (jury was instructed on lesser included offense of voluntary manslaughter); *Plewka*, 27 Ill. App. 3d at 554 (jury convicted defendants of lesser included offense of contributing to sexual delinquency of child).

¶ 86    But these distinctions are beside the point.  There might be a case out there where a reviewing court has truly invoked its power to reduce the degree of a criminal conviction *sua sponte*.  The purpose of my dissent is to illustrate why we should refrain from taking such action.  The majority believes that it has prevented an injustice.  I disagree.  "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."  *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment).  I fail to see how the majority has prevented an injustice in this case by disrupting the natural course of our adversarial system.

¶ 87    The majority reasons that its ruling is justified by the outcome in *Kennebrew*.  There, "the State did not charge the defendant with aggravated criminal sexual abuse for the conduct [involving alleged sexual penetration], did not request a lesser-included offense instruction for that conduct, did not mention a possible lesser-included offense for that conduct in its response brief before the appellate court, and waited nearly a year and a half after the jury's verdicts to raise that issue in its petition for leave to appeal."  *Kennebrew*, 2013 IL 113998, ¶ 58 (Theis, J., dissenting).  Our supreme court's majority looked past these shortcomings and disregarded the ordinary rules of forfeiture, noting that it was within its authority to enter a supervisory order directing us to consider utilizing Rule 615(b)(3), which "provides the appellate court with broad authority to reduce the degree of a defendant's conviction."  *Id.* ¶ 25 (majority opinion).

¶ 88    I realize that this case and *Kennebrew* involve the same offenses and a similar evidentiary issue, but these coincidences are irrelevant.  Respectfully, I disagree with Justice Jorgensen's conclusion that *Kennebrew* included any dictates or that our supreme court charted the proper remedy under these circumstances.  Nothing in *Kennebrew* suggests that a reviewing court

should exercise its authority under Rule 615(b)(3) *sua sponte*. The lesser included offense would not have been considered in *Kennebrew* if the State had not raised the issue in its petition for leave to appeal from our judgment reversing the defendant's conviction. There is no indication that we risked an injustice by failing to act in the absence of the State's request.

¶ 89    It is baffling that the State would overlook the same issue in this case that it overlooked in *Kennebrew*. In my view, if the State wants a conviction of the lesser included offense in this case, it should resort to the same tactic it utilized in *Kennebrew*. The State should raise the issue for the first time in a petition for leave to appeal to our supreme court. Perhaps the outcome would be the same as in *Kennebrew*. Perhaps then we would receive some guidance as to whether we should be doling out justice when the State overlooks the possibility of convictions of lesser included offenses. Then again, *Kennebrew* involved a "very specific set of facts" (*id*.), and our supreme court might not be so generous a second time. Either way, justice requires that defendant's convictions are sought and obtained by the State.

¶ 90    In closing, I remind my colleagues that "courts are essentially passive instruments of government. We do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of rehearing *en banc*). By ignoring these precepts, the majority has relieved the State of any potentially adverse consequences that might otherwise result from its repeated oversight. Respectfully, disrupting our adversarial system for the sake of preventing a perceived injustice is not the function of this court, nor should it be.